IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARSHALL ARNOLD, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14 C 3723 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| OFFICER MICHAEL JANKOVIC, OFFICER | ) | |
| JOHN VENTRELLA, OFFICER THOMAS | ) | |
| ACCARDO, OFFICER DAVID IVANOV, | ) | |
| SERGEANT DAVID NATELSON, DETECTIVE | ) | |
| TERENCE HART, and the CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Marshall Arnold has brought a nine count complaint against Chicago Police

Department Officers Michael Jankovic, John Ventrella, Thomas Accardo, David Ivanov,

Sergeant David Natelson, Detective Terence Hart, and the City of Chicago. Count I asserts a

claim for illegal search and seizure in violation of the Fourth Amendment to the United States

Constitution. Count II is a claim for failure to intervene, and Count III is simply titled

"conspiracy" but appears to allege that all defendants conspired to violate plaintiff's Fourth

Amendment rights. Count V[1] is a state law claim for assault and battery and, although not

labeled as such, appears to be brought only against defendants Accardo and the City. Counts VI

through VIII are state law claims for intentional infliction of emotional distress (IIED), malicious

prosecution, and false arrest. Count IX and X are claims for respondeat superior liability and

indemnification, and appear to be brought against the City, although they do not actually make

---

[1]The complaint contains no Count IV.

that allegation.  Defendants have moved for summary judgment on all counts.  For the reasons described below, the motion is granted.

## FACTS

On June 17, 2013, Raoul Perez was driven by a co-worker to a friend's home at Lakewood and Albion in Chicago.  The co-worker dropped Perez off down the street from the friend's home because of parking problems.  Perez walked down the street to his friend's building, but because the entrance buzzers were not labeled, he was unable to identify which was his friend's apartment.  He texted (and called) his friend to let him in.  While he was waiting, he was approached by an African-American male wearing a dark hoodie and a hat with red lettering.  The person began acting as if he, too, was waiting to be let into the building.  The person then looked around, put his hand into the pocket of his hoodie as if he had a gun, and told Perez he would shoot if Perez did not hand over his wallet.  Perez told the man to leave him alone and the two began to scuffle with both punching each other.  Ultimately, they landed on the ground in a grassy area between the building and sidewalk, and continued fighting, when a pedestrian approached.  Perez yelled for help and the attacker ran away.  Perez then gained entry to the building by following the pedestrian in.  He sat on the steps and called his co-worke, and told her he had been "jumped."

During this time, Officers Ventrella and Jankovic in one car, and Accardo and Ivanov in another, were each responding to a disturbance call in the same area.  That call was the result of a homeless person creating a disturbance.  After they had completed their call, Jankovic and Ventrella were approached by Perez's co-worker.  The co-worker told them that her friend had just been attacked up the street. Ventrella and Jankovic went to Perez, who told them what had

2

happened. Perez verbally gave Ventrella a description of his assailant. According to Perez, he told Ventrella that it was an African-American male, 5'7" to 5'9" tall, 170 pounds, average build, wearing a black hoodie with baggy jeans and a black hat with red lettering.

Ventrella broadcasted the description over the radio in what the Chicago Police Department calls a "flash message." Ventrella does not remember the exact message that he broadcast, but testified that he broadcast what he was told. The flash message was recorded by the dispatcher as:

> MB 30's 506-600 160-180 B Hawks hat BLK tee, blue jeans possibly with
> red/wht jck . . .

Officers Accardo and Ivanov arrived on the scene and, after speaking with Jankovic and Ventrella and with Perez, drove Perez around the immediate area looking for the offender. During this time, Ivanov began generating the police report on the portable data terminal in the squad car. He recorded Perez's personal information and asked Perez for a description of the suspect, which he then recorded into the report. That description matches the description Perez claims to have given to Ventrella. The three drove around for approximately five to ten minutes before dropping Perez back where the incident took place. At that time they had asked him "just in case we find him tonight, would you be willing to identify him." Perez responded, "Sure." After dropping Perez off, Accardo and Ivanov continued driving around the area.

Meanwhile, Sergeant Natelson heard the flash message and began driving around the area. As he drove by St. Ignatius Church, he saw plaintiff, an African-American male in a black tee shirt with a black hat with red lettering. Although the hat was not a Blackhawks hat (as the flash message had described it), Natelson thought the person sufficiently fit the description in the flash message and contacted Accardo and Ivanov to indicate he had a possible suspect. Accardo

3

and Ivanov went to the church, where they saw plaintiff sitting on the steps wearing dark clothing with a black hat with red lettering. Ivanov and Accardo approached plaintiff, announcing their presence. Ivanov asked plaintiff for his identification. The officers testified that plaintiff did not initially comply. Plaintiff disputes this, but at some point did produce identification. The officers explained the situation, performed a protective pat-down, placed plaintiff in handcuffs and put him into their police vehicle. Ivanov contacted Perez to see if he was available for a "show-up." Accardo then contacted Ventrella and Jankovic and asked them to pick up Perez and bring him to the church. Ventrella and Jankovic got Perez, drove him to the church, explaining along the way what would be happening. In so doing, Jankovic told Perez that they were "trying to get a positive ID on the person they had stopped." He explained the procedure, and said they would ask him "if he could positively identify the offender."

Once at the church, Jankovic and Ventrella pulled their car in front of and facing Accardo's car. Plaintiff was removed from Accardo's car and placed in front, where he was illuminated by the headlights and spotlights of both cars. Plaintiff was still handcuffed with Accardo and Ivanov on each side. Perez then positively identified plaintiff, repeatedly saying he was sure, and that he recognized plaintiff's face and the black hoodie he was wearing. During the show-up, plaintiff did not have his hat on. Perez testified, both in his deposition in the instant case and at plaintiff's criminal trial, that no one "coached him" or coerced him to identify plaintiff, and he has remained steadfast in his identification. The show-up occurred approximately 30 to 40 minutes after the alleged incident.

After the identification, Accardo and Ivanov took plaintiff to the police station. The case was assigned to Detective Hart, who spoke with the officers. He also spoke with Perez by phone

4

and had a brief conversation with plaintiff.  Plaintiff claims that beginning when he was first approached by Accardo and Ivanov he repeatedly told everyone that he was at home with his mother and daughter at the time of the incident.  It is undisputed that none of the officers ever spoke with plaintiff's mother or daughter.  One week later, plaintiff was taken to a preliminary hearing at which Detective Hart testified.  The court found probable cause for the charges, and plaintiff was held at the Cook County Jail because he could not post bail.

Plaintiff went to trial on charges of attempted aggravated robbery, aggravated battery, and unlawful restraint.  The court found him "not guilty" at the close of the state's case, concluding that the only evidence against plaintiff was Perez's identification, and that the show-up was overly suggestive.

## DISCUSSION

Defendants have moved for summary judgment on all counts.  Summary judgment is appropriate when the moving papers and affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once a moving party has met its burden, the nonmovant must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(c); Becker v. Tenenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990).  The court considers the evidence as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion.  See Green v. Carlson, 826 F.2d 647, 651 (7th Cir. 1987).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

248 (1986). The nonmoving party must, however, "do more than simply show that there is some metaphysical doubt about the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). "There mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient, there must be some evidence on which the jury could reasonably find for the [nonmoving party]." <u>Anderson</u>, 477 U.S. at 252.

## I.     The Federal Claims

In Counts I through III, plaintiff alleges that defendants violated his rights under the Fourth Amendment by conducting an illegal search and seizure, failing to intervene in the violation of his rights, and conspiring to violate his rights. Because the counts do not indicate which defendants are accused of which violations, the court assumes that each count is brought against each defendant. All three counts depend on plaintiff identifying a genuine issue of fact as to whether his rights under the Fourth Amendment to be free from an illegal search and seizure were violated. He cannot do so.

With respect to the seizure, there are two separate claims at issue. <u>See</u> <u>Pike v. Foster</u>, 2016 WL 537940, *3 (N.D. Ill. Feb. 11, 2016). The first is whether Natelson, Accardo, and Ivanov had reasonable suspicion to detain plaintiff. The second is whether the seizure afterwards, including handcuffing and detaining plaintiff for the show-up, was reasonable. <u>Id</u>. Although plaintiff has not actually differentiated between these claims, he does contend that Accardo and Ivanov did not have reasonable grounds to conduct the initial investigatory stop because he did not match the flash message description.

"Police officers may conduct a brief investigatory stop of a person when they have reasonable, articulable suspicion that criminal activity is afoot." <u>Id</u>. at *4 (citing <u>Terry v. Ohio</u>,

392 U.S. 1, 30 (1968)). Reasonable suspicion is less demanding than probable cause. Id. (citing

U.S. v. Sokolow, 490 U.S. 1, 7 (1989)). There must be "at least a minimum level of objective

justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). This standard

requires more than an "inarticulate hunch." Terry, 392 U.S. at 22. Courts "examine the totality

of the circumstances known to the police at the time of the stop, including the experience of the

officers and the behavior and characteristics of the suspect." Pike, 2016 WL 537940 at *4

(citing U.S. v. Lenoir, 318 F.3d 725, 729 (7th Cir. 2003)). When determining whether an

investigatory stop is reasonable under the Fourth Amendment courts examine (a) "whether the

police were aware of specific and articulable facts giving rise to a reasonable suspicion, and (b)

"whether the degree of the intrusion was reasonably related to the know facts." Pike, 2016 WL

5347940 at *3 (citing U.S. v. Tilmon, 19 F.3d 1221, 1224 (7th Cir. 1994); U.S. v. Bullock, 632

F.3d 1004, 1012 (7th Cir. 2011)).

"Police observation of an individual, fitting a police dispatch description of a person

involved in a disturbance, near in time and geographic location to the disturbance establishes a

reasonable suspicion that the individual is the suspect of the dispatch." Id. at *4 (quoting Lenoir,

318 F.3d at 729).

Plaintiff argues that Accardo and Ivanov lacked a reasonable suspicion to conduct even

an investigatory stop because he did not match the description in the flash message and was not

acting in a suspicious manner. In particular, plaintiff argues that he was not wearing a

Blackhawks hat or a red and white jacket. But Natelson, who was the only officer acting solely

on the flash message, saw plaintiff approximately 20 minutes after the disturbance, and

concluded only that plaintiff matched the general description in the message of an African

American male, approximately 5'6 to 6'0, wearing a dark tee shirt and a black hat with red lettering which, although not a perfect match, is similar to a Blackhawks hat. He did not approach plaintiff at that point, but simply sent out a call to Accardo and Ivanov indicating that he had a possible suspect. Once Accardo and Ivanov arrived, they saw that plaintiff matched the description given to them by Perez while they were driving him around the neighborhood. At this point, Accardo and Ivanov had a reasonable suspicion that plaintiff was the offender and had reasonable grounds to approach and detain him. No reasonable jury could conclude otherwise.

Moreover, even if there is a possible question as to whether Accardo and Ivanov had reasonable suspicion, plaintiff's claim would be barred by the qualified immunity doctrine, which protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pike, 2016 WL 537940 at *6 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818(1982)). The doctrine balances the need to hold public officials accountable when they exercise power irresponsibly against the need to shield officials from harassment, distraction, and
liability when they perform their duties reasonably. Id. Qualified immunity provides officials with the ability "'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" Id. (quoting Anderson v. Creighton, 483 U.S. 635, 646 (1987)). This standard leaves room for mistakes in judgment by "'protecting all but the plainly incompetent or those who knowingly violate the law.'" Id. (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)).

In the instant case, no officer possessing the information Accardo and Ivanov possessed would know, or even suspect, that stopping plaintiff would violate the Fourth Amendment. As in Pike, there is no governing case that spells out why all the facts known to Accardo and Ivanov would not give rise to reasonable suspicion. Indeed, the law is just the opposite. Consequently, qualified immunity would defeat plaintiff's claim that the investigatory stop was not supported by reasonable suspicion. Id.

Because the officers had a reasonable suspicion to stop plaintiff, the only remaining issue is whether the degree of intrusion was reasonably related to the known facts. Tilmon, 19 F.3d at 1224. With respect to plaintiff's claim, the question is whether Accardo and Ivanov had reason to handcuff plaintiff and keep him in the car for presentation in the show-up, or whether doing so amounted to arrest without probable cause.

Handcuffing and placing a suspect in the backseat of a police car does not automatically convert an investigatory stop into a formal arrest. U.S. v. Stewart, 388 F.3d 1079, 1084-85 (7th Cir. 2004). There is no litmus test for determining when a seizure exceeds the bounds of an investigatory stop and becomes an arrest. Id. (citing Tilmon, 19 F.3d at 1224). The "permissible scope of a Terry stop has expanded in recent years to include the use of handcuffs and temporary detention in squad cars." Stewart, 388 F.3d at 1084.

In the instant case, plaintiff was detained just long enough to wait for Perez to arrive for a show-up. The pre-identification detention was for a matter of minutes only. As noted in Pike, "in the absence of a prolonged detention officers may transport a subject back to a crime scene for identification as part of a lawful Terry stop." Pike, 2016 WL 537940 at *6 (and cases cited

9

therein).  Thus, the court concludes that Accardo's and Ivanov's decision to handcuff plaintiff and wait for a show-up was not an unlawful arrest, but part of a lawful <u>Terry</u> stop.

Finally, it is beyond dispute that once Perez unconditionally and unequivocally identified plaintiff as his attacker, the officers had probable cause to arrest plaintiff.  An identification by a single eye-witness is sufficient probable cause.  <u>Tangwall v. Stuckey</u>, 135 F.3d 510, 520 (7th Cir. 1998); <u>Gramenos v. Jewel Cos., Inc.</u>, 797 F.2d 432, 439 (7th Cir. 1986).  Despite plaintiff's protestations to the contrary, the arresting officers had no duty to investigate plaintiff's claims that he was somewhere else.  <u>See</u> <u>Crawford v. City of Chicago</u>, 2014 WL 1661720 (N.D. Ill. 2014).

Plaintiff's argument that Perez's identification is not credible because the officers coached him is based on pure speculation and not supported by any evidence in the record. Perez testified that he was not coached and was unequivocal in his identification.  Plaintiff's theory of the case is that because he is innocent, the only reasonable explanation for his arrest is that defendants conspired with Perez to blame him for the attack.  This court has reviewed every deposition submitted, as well as the transcript of the criminal trial, and has not found even "a scintilla" of evidence to support that claim.  Plaintiff's suggestion that defendants altered the description in the report to match plaintiff's description is equally unsupported. Ivanov entered the description into the report while driving Perez around the neighborhood, well before Natelson even saw plaintiff.  Consequently, defendant's motion for summary judgment on Count I is granted.  Because there is no underlying constitutional violation, summary judgment is also granted as to Count II, failure to intervene in a constitutional violation, and Count III, conspiracy to commit a constitutional violation.

**II.** **State Claims**

In Count V, plaintiff asserts a claim for assault and battery against Officer Accardo, presumably because Accardo placed him in handcuffs. Plaintiff does not claim, nor is there any evidence to support a claim, that Accardo physically abused him or that plaintiff sustained any physical injuries. There is no evidence that Accardo used any greater force than what was reasonably necessary under the circumstances. Consequently there is no evidence to support a claim for assault and battery. See Gill v. Village of Melrose Park, 35 F.Supp.3d 956, 967-68 (N.D. Ill. 2014) (use of force necessary to make a lawful arrest cannot constitute battery).

In Count VI, plaintiff brings a claim for IIED against all defendants. To prove this claim, plaintiff has to establish that: (1) defendants' conduct was extreme and outrageous; (2) defendants either intended to inflict emotional distress or knew that there was at least a high probability that they would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress. Rebolar v. City of Chicago, 897 F.Supp.2d 723, 741 (N.D. Ill. 2012). Conduct is extreme and outrageous when it is so extreme as to go beyond all possible bounds of decency and is to be regarded as intolerable in a civilized community. Id.

In the instant case, the court has already determined that the officers acted reasonably in detaining plaintiff and then had probable cause to arrest him. Again, plaintiff's theory is to suggest that Perez was never actually attacked, and that he and the officers conspired to arrest plaintiff. The theory makes no sense, and plaintiff has offered no explanation why Perez would concoct such a story. In any event, there is no support for the theory in the record. Consequently, defendant's motion for summary judgment on Count VI is granted.

11

Count VII asserts a claim for malicious prosecution. To sustain this claim, plaintiff must establish: (1) the commencement or continuation of criminal proceedings by defendants; (2) termination of the prosecution in plaintiff's favor in a manner indicative in innocence; (3) the absence of probable cause for the proceeding; (4) malice; and (5) damages. Adams v. Sussman & Hertzberg, Ltd., 292 Ill.App.3d 30, 41 (1977). Plaintiff was charged with attempted aggravated robbery, aggravated battery, and unlawful restraint. As the state court held, there was probable cause for each charge.

First, aggravated robbery under Illinois law is an attempt to knowingly take property from another by use of force of threat of imminent force while indicating that he is armed with a firearm. See 720 ILCS 5/8-4(a) (definition of attempt); 720 ILCS 5/18-1(b)(1) (definition of aggravated robbery). Perez consistently maintained that plaintiff attempted to take his wallet while indicating that he had a gun. That is sufficient probable cause for charging the offense.

Second, plaintiff was charged with aggravated battery, which is defined as committing a battery in a public way. 720 ILCS 5/12-3.05(c). Again, Perez indicated that plaintiff physically attacked him on the grassy area in front of an apartment building. This statement by Perez is sufficient to create probable cause.

Third, plaintiff was charged with unlawful restraint, which is defined as occurring when one "knowingly without legal cause detains another." 720 ILCS 5/10-3(a). "The gist of unlawful restraint is the detention of a person by some conduct which prevents him from moving from one place to another." People v. Bowen, 241 Ill.App.3d 608, 627-28 (4th Dist. 1993). Under Perez's version of the incident, he was clearly restrained from movement when the

12

assailant indicated that he had a gun and demanded Perez's wallet.  See People v. Lee. 376

Ill.App.3d 951, 958 (1st Dist. 2007).

Because defendants had probable cause to charge plaintiff with the three offenses,

defendants' motion for summary judgment on Count VII is granted.

Count VIII is a claim for false arrest under state law which requires plaintiff to establish

that defendants did not have reasonable grounds to arrest him.  Miller v. Lewis, 381 F.Supp.2d

773, 788 (N.D. Ill. 2005).  Because the court has already determined that defendants had

probable cause to arrest plaintiff, summary judgment is granted on Count VIII.  See Gill, 35

F.Supp.3d at 967 (Reasonable grounds and probable cause are synonymous for purposes of

arrest.).

Finally, Counts IX and X are brought against the City, asserting that it is liable for the

individual officers' actions based on respondeat superior and indemnity.  Because this court has

granted summary judgment to the individual defendants on all state law claims, summary

judgment is appropriate in favor of the City on Counts IX and X.  See Rebolar, 897 F.Supp.2d at

742.

### CONCLUSION

For the reasons described above, defendants' motion for summary judgment (Doc. 44) is

granted.  Judgment is to be entered in favor of all defendants on all counts.

**ENTER:**      **April 19, 2016**

 

**Robert W. Gettleman**
**United States District Judge**